UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                              )

                                    )

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| VIJAY K. TANEJA *et al.* | ) | Case No. 08-13293-SSM |
| | ) | Chapter 11 |
| Debtors | ) | Jointly Administered |
| | ) | |
| HSBC BANK USA, N.A. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 09-1047 |
| | ) | |
| H. JASON GOLD, TRUSTEE | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION**

Before the court is the motion of the chapter 11 trustee to dismiss the amended complaint filed by HSBC Bank USA National Association ("HSBC") for failure to state a claim for relief. This is an action to determine the validity of HSBC's claimed lien against property of the debtor and to impose a constructive trust against the sales proceeds held by the trustee. The controversy arises because the deed of trust securing the note that HSBC purchased from a prior holder was released—approximately 2 ½ years before the filing of the bankruptcy petition—by what the complaint alleges was an unauthorized and fraudulent certificate of satisfaction. After hearing oral argument from the parties, the court continued the motion to March 8, 2010, at which time the court ruled from the bench that the motion to dismiss would be granted. The purpose of this

1

opinion is to supplement the bench ruling and to explain more fully, for the benefit of the parties

and any reviewing court, the reasons for the court's decision.

<u>Background</u>

On June 9, 2008, Vijay K. Taneja ("the debtor") and four companies controlled by him,

including a mortgage loan originator known as Financial Mortgage, Inc. ("FMI"), filed voluntary

petitions in this court for reorganization under chapter 11 of the Bankruptcy Code.[1]  H. Jason

Gold has been appointed as chapter 11 trustee in all five cases, which are being jointly

administered.

Among the assets listed on the debtor's schedules was a condominium unit located at

4862 Eisenhower Avenue, Unit #465, Alexandria, Virginia.  On December 23, 2008, the trustee

filed a motion to sell the unit free and clear of liens for $285,000.  The motion acknowledged the

existence of an unreleased memorandum of lis pendens in favor of Wells Fargo Bank but

represented that there were no other liens or encumbrances of record against the property.

HSBC filed a response asserting that it was the holder of an unpaid note secured by a $375,920

deed of trust against the property and opposing a sale free and clear of its interest unless it was

paid in full.  (It also filed a motion for relief from the automatic stay in order to enforce the deed

of trust).  Following a hearing on January 26, 2009, HSBC dismissed its motion for relief from

the automatic stay, and a consent order was entered on January 30, 2009, approving the sale free

and clear of liens, with the net proceeds to be held in escrow pending a determination of HSBC's

---

[1]  The four companies were Elite Entertainment, Inc., Case No. 08-13286-SSM; Financial
Mortgage, Inc., Case No. 08-13287-SSM; NRM Investments, Inc., Case No. 08-13290-SSM; and
Taneja Center, Inc., Case No. 08-13292-SSM.

2

rights to them.  A report of sale filed by the trustee reflects that he is holding net proceeds in the amount of $254,519.85.

The present adversary proceeding was filed by HSBC on February 24, 2009, naming both the chapter 11 trustee and "Proceeds of Sale of 4862 Eisenhower Avenue #465 Alexandria, Virginia" as defendants.  The complaint was pleaded in a single count and alleged that HSBC was the beneficiary of a deed of trust recorded against the property on June 9, 2005 in favor of Financial Mortgage, Inc. ("FMI"); that the deed of trust had been released by a "false" certificate of satisfaction recorded by the debtor, as president of FMI, *after* the note had been sold; that the trustee's "strong arm" powers as a hypothetical lien creditor or bona fide purchase of real estate would not allow him to avoid the lien securing HSBC; and that the property "is not part of the debtor's estate."

An answer was filed by the chapter 11 trustee, and the parties commenced discovery.  On November 12, 2009—approximately 7 months after the filing of the answer—new counsel was substituted for the law firm that had filed the original complaint.  The new firm promptly filed a motion to amend the complaint. The trustee consented to the motion, and the amended complaint attached to the motion was "deemed filed" by order entered on December 14, 2009.[2]  The amended complaint differs from the original in three major respects: first, the claim to establish the validity and priority of HSBC's lien and the claim for imposition of a constructive trust are pleaded in separate counts rather than being combined in one; second, Washington Mutual Bank, F.A., is identified as the holder of the note at the time FMI signed and recorded the certificate of

---

[2] The practice of not actually filing an amended pleading as a separate docket entry but "deeming" a mere exhibit to the motion as the amended pleading, is greatly to be deprecated, since it turns a search for the amended complaint into a treasure hunt.

satisfaction; and third, the complaint sets forth a detailed history of multiple conveyances,

encumbrances, and releases—all occurring within a six month period—that HSBC alleges would

have excited the suspicions of a prudent purchaser from the debtor and provided constructive

knowledge of the fraudulent release.[3]  Specifically, the complaint alleges that the debtor initially

acquired title to the property from the developer with a loan made by FMI, which was then sold

to Washington Mutual Bank, F.A., and ultimately acquired by HSBC as part of a securitization.

The complaint further identifies six subsequent conveyances within a six month period, the last

of which returned title to the debtor.  During the same time frame, a total of eleven additional

deeds of trust were recorded, all of them securing Mortgage Electronic Registration Systems,

Inc. ("MERS") as nominee for FMI, and all of them released by certificates of satisfaction signed

by the debtor as president of FMI.  The present motion to dismiss the amended complaint was

filed by the trustee on January 11, 2010.

<u>Discussion</u>

I.

A complaint may be dismissed at the outset of the litigation if it fails to state a claim

upon which relief may be granted.  Fed.R.Bankr.P. 7012(b); Fed.R.Civ.P. 12(b)(6).  As the

Supreme Court has cautioned, however, "When a federal court reviews the sufficiency of a

complaint, before the reception of any evidence either by affidavit or admissions, its task is

necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether

the claimant is entitled to offer evidence to support the claims."  *Scheuer v. Rhodes*, 416 U.S.

---

[3] A chart summarizing the transfers, encumbrances and releases as recited in the amended
complaint is attached as an exhibit to this opinion.

232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).  Additionally, "it is well established that,

in passing on a motion to dismiss. . . for failure to state a cause of action, the allegations of the

complaint should be construed favorably to the pleader." *Id.*  At the same time, a plaintiff must

provide grounds for entitlement to relief, which requires more than labels and conclusions or a

formulaic recitation of the elements of a cause of action, and the well-pleaded factual allegations

must "plausibly" support an entitlement to relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937, 173

L.Ed.2d 868 (2009).

      The present motion, although styled as a motion to dismiss, partakes in large measure of

a motion for summary judgment, particularly in terms of timing.  The parties have engaged in

extensive discovery, and, with one significant exception, there does not appear to be a dispute as

to the underlying facts.[4]  The amended complaint does not plead any new or additional causes of

action but merely refines the existing complaint in light of what the plaintiff has learned through

investigation and discovery.   The trustee, moreover, never conceded that the original complaint

stated a claim for relief and specifically pleaded, as an affirmative defense, that it did not.

Answer at 5.  Although such a defense is more commonly raised by motion prior to pleading, the

rules expressly permit a defense of failure to state a claim for relief to be raised at the pleader's

option either by motion or in a responsive pleading.  Fed.R.Bankr.P. 7012(b); Fed.R.Civ.P.

12(b).  Indeed, the defense of failure to state a claim for relief is not waived by failure to assert it

---

[4]  The trustee, observing that the original and the follow-on loans were held by the same lender
(Washington Mutual Bank, F.A.), does not admit that the release of the original deed of trust was
made without authority.  The trustee concedes, however, that for the purpose of the motion to
dismiss, the well-pleaded facts in the complaint must be accepted as true.

in a motion or responsive pleading and may be raised for the first time at trial.  Fed.R.Bankr.P. 7012(b); Fed.R.Civ.P. 12(h)(2).  Accordingly, there is no bar to considering the present motion even though the defense of failure to state a claim for relief was not made by motion with respect to the original complaint.

II.

In his motion, the trustee asserts that under Virginia law an innocent purchaser for value may conclusively rely on the land records, and that such a purchaser would therefore take free of the released deed of trust, even if the release was unauthorized.  As a result, says the trustee, his "strong-arm" powers under § 544(a) of the Bankruptcy Code trump any equitable claim by HSBC to recognition of the deed of trust as a valid lien against the property.  HSBC disputes the trustee's legal analysis and in particular asserts that the multiple transfers of title and multiple deeds of trust and releases within a short period of time as shown on the land records would have excited the suspicion of a prudent purchaser and would therefore have provided constructive notice that the deed of trust might have been released without authority.

A.

As a threshold matter, HSBC argues that § 544(a) is not self-executing, and that unless and until the trustee formally asserts his strong-arm avoidance powers in a counterclaim, procedurally there is no issue for the court to consider.  Although it is true that an avoidance claim would normally be set forth by the trustee in an affirmative pleading, HSBC's argument ignores the fact that it was its own complaint that expressly raised the issue by asserting that the trustee's strong-arm powers could not trump its equitable claim to restoration of its deed of trust.  Complaint ¶¶ 21-26.  Specifically, the complaint recited the trustee's avoidance powers as a

6

hypothetical bona fide purchaser from the debtor on the filing date of the petition, Complaint ¶¶

21, 24, and asserted that "The Trustee's 'strong arm' avoidance powers do not allow him to

avoid HSBC's secured interest in the property." Complaint ¶ 26.   The trustee's answer joined

issue, albeit somewhat equivocally ("[T]hese allegations are legal conclusions to which no

response is required.  To the extent a response is required, the Bankruptcy Code specifies the

Trustee's strong arm powers; all remaining allegations are denied.").  Having itself teed up the

issue of whether the trustee's strong arm powers trumped the deed of trust, HSBC is in a poor

posture to complain, some seven months later, that the trustee should have filed a counterclaim

instead of simply answering the complaint.  The court can discern no possible prejudice to

HSBC from the procedure, even if irregular, that it itself initiated, and the court will therefore

reach the merits of the issue.

B.

A brief review of basic principles is in order.  The filing of a bankruptcy petition creates

an "estate" composed of, among other things, "all legal or equitable interests of the debtor in

property as of the commencement of the case[.]" § 541(a)(1), Bankruptcy Code.  This is subject

to the qualification, however, that

> [p]roperty in which the debtor holds, as of the commencement of the case, only
> legal title and not an equitable interest . . . becomes property of the estate *under*
> *subsection (a)(1) or (2)* of this section only to the extent of the debtor's legal title
> to such property, but not to the extent of any equitable interest in such property
> that the debtor does not hold.

§ 541(d), Bankruptcy Code (emphasis added).  Put another way, a bankruptcy trustee who is

claiming under § 541(a)(1) as successor to the debtor cannot acquire any greater rights in

property than the debtor had, and takes the debtor's property subject to any equities in favor of

7

third parties. *Mayer v. United States (In re Reasonover)*, 236 B.R. 219, 226 (Bankr. E.D.

Va.1999), *vacated and remanded on other grounds*, 238 F.3d 414 (4th Cir. 2000) (unpublished

table decision), *op. on remand*, 2001 WL 1168181, 2001 Bankr. LEXIS 2109 (Bankr. E.D. Va.,

April 16, 2001).

Property of the estate, however, is not limited to property of the debtor but also includes

property or interests that the debtor does not own but that the trustee is able to set aside or

recover for the benefit of creditors under one or more of his special avoidance powers. §

541(a)(3), (4); *In re Cascade Oil Co., Inc*., 65 B.R. 35, 39 (Bankr. D. Kan. 1986) (trustee enjoys

additional powers in no way derivative of the debtor's rights under state law).  Among such

avoidance powers are the so-called "strong-arm" powers in § 544(a), Bankruptcy Code, and in

particular, the trustee's rights as a hypothetical purchaser of real estate and hypothetical

judgment lien creditor:

> The trustee shall have, as of the commencement of the case, and without regard to
> any knowledge of the trustee or of any creditor, the rights and powers of, or may
> avoid any transfer of property of the debtor or any obligation incurred by the
> debtor that is voidable by—
>
> (1) a creditor that extends credit to the debtor at the time of the
> commencement of the case, and that obtains, at such time and with respect to such
> credit, a judicial lien on all property on which a creditor on a simple contract
> could have obtained such a judicial lien, wether or not such a creditor exists.
>
> * * *
>
> (3)  a bona fide purchaser of real property, other than fixtures, from the
> debtor, against whom applicable law permits such transfer to be perfected, that
> obtains the status of a bona fide purchaser and has perfected such transfer at the
> time of the commencement of the case, whether or not such a purchaser exists.

§ 544(a), Bankruptcy Code.  Simply stated, the bankruptcy trustee is in the same position, with

respect to real estate, as if he were a bona fide purchaser who bought the property from the

8

debtor on the filing date and simultaneously perfected the transfer by recording a deed, or if he had extended credit to the debtor on the filing date and on the same date had obtained a judgment lien against the property. *Reasonover,* 236 B.R. at 227. Thus, if under Virginia law a bona fide purchaser who had bought the Eisenhower Avenue condominium from the debtor on June 9, 2008, and recorded a deed the same day, or a creditor who had docketed a judgment lien against the debtor on that day, would have taken free and clear of a falsely-released deed of trust, so does the bankruptcy trustee.

The outcome, it must be stressed, is not affected by the claimed assertions of a constructive trust unless, under state law, a constructive trust would trump the interest of a bona fide purchaser or a judgment lien creditor. Nor, for that matter, is it affected by the statutory exclusion from the bankruptcy estate in § 541(d) of property held by the debtor in trust for another. *Reasonover,* 236 B.R. at 227-28. That exclusion, by its express terms, applies only to property coming into the bankruptcy estate under §§ 541(a)(1) and (2) of the Bankruptcy Code. The exclusion does not reference, and has no applicability to, property coming into the bankruptcy estate under §§ 541(a)(3) and (4) through exercise of the trustee's avoidance powers. Similarly, §§ 541(a)(3) and (a)(4) make no reference to § 541(d). The result is that bankruptcy trustees may—and routinely do—use their strong-arm avoidance powers to set aside unperfected security interests and unrecorded conveyances, even though such security interests and conveyances could be enforced against the debtor under state law.

C.

If the present case involved merely an <u>unrecorded</u> deed of trust, there can be little doubt

that in Virginia a bona fide purchaser would take title to the property free of any claim by the

noteholder.  As this court has previously explained:

> Under the Virginia recording statutes, unrecorded conveyances and deeds of trust
> are "void as to all purchasers for valuable consideration without notice not parties
> thereto and lien creditors."  Va. Code Ann. § 55-96(A)(1).  Furthermore, it is well
> established in Virginia that a bona fide purchaser takes property free of any latent
> equity against it.  *See, e.g., Snyder v. Grandstaff*, 96 Va. 473, 31 S.E. 647, 648
> (1898) (bona fide purchaser not affected by a latent equity of reformation
> grounded on mutual mistake); *Ransome v. Watson*, 145 Va. 669, 134 S.E. 707
> (1926) (resulting trust not good against a bona fide purchaser); *Pair v. Rook*, 195
> Va. 196, 77 S.E.2d 395 (1953) (constructive trust).

*Reasonover*, 236 B.R. at 232.  A recorded but falsely-released deed of trust, however, raises a

more difficult issue.  In the majority of states, the modern rule is that the holder of a note secured

by a recorded mortgage or deed of trust that is released without authority will prevail over an

innocent purchaser of the property.  "Reinstatement and Restoration of Mortgages Released or

Discharged Without Authorization, as Against Subsequent Purchasers, Lienholders, Judgment

Creditors, and the Like, Without Notice," 35 A.L.R.2d 948 § 5[a] (1954 & Cumm. Suppl.) ("A

mortgage discharged of record by a fraud or forgery without the participation, knowledge, or

negligence of the mortgagee, takes precedence over the rights of subsequent innocent purchasers

or encumbrancers."); *see, e.g., First Fin. Savings Bank, Inc. v. Sledge*, 106 N.C.App. 87, 88, 415

S.E.2d 206, 207 (1992) ("The discharge of a perfected mortgage upon public record by the act of

an unauthorized third party entitles the mortgagee to restoration of its status as a priority

lienholder over an innocent purchaser for value.").

The rule in Virginia, however, is different.  Although no modern case has discussed the

issue, a century-old opinion by the Supreme Court of Appeals of Virginia (now the Supreme

Court of Virginia) squarely held that an innocent encumbrancer prevailed over the holder of a

note secured by a prior deed of trust that had been released without authority. *Evans Bros. v.*

*Roanoke Savings Bank*, 95 Va. 294, 28 S.E. 323 (1897). That case involved two adjoining

parcels of real estate in Roanoke, Virginia, one fronting on Rutherford Street and the other on

Walker Street, owned by one Lizzi Reed. Reed borrowed $800, represented by two $400

promissory notes, from one C. A. Myers. At that time there was an existing deed of trust in the

amount of $1,000 against the Rutherford Street parcel in favor of Old Dominion Savings and

Loan Association, but the Walker Street parcel was unencumbered. The notes in favor of Myers

were secured by a deed of trust against both parcels. Myers later sold the notes at a discount to

Roanoke Savings Bank. Reed subsequently granted a deed of trust against the Rutherford Street

parcel to secure Evans Brothers in the amount of $600 and a separate deed of trust against the

Walker Street property to secure Covenant Building & Loan Association in the amount of

$1,200. Evans Brothers and Covenant each required the release of the deed of trust securing the

Myers loan. Myers, although no longer the holder of the notes, having previously transferred

them to the Roanoke Savings Bank, nevertheless signed on the margin of the deed book a

satisfaction of the deed of trust against both parcels. With respect to the Walker Street property,

the Court reasoned that Covenant prevailed over Roanoke Savings Bank:

> The effect [of the marginal satisfaction] was to release the incumbrance referred
> to. The Covenant Building & Loan Association thus became the first lienor upon
> . . . the lot . . . . It is true that the equity of the Roanoke Savings Bank was
> unaffected. It had acted in good faith; had lent its money after an examination of
> the record, which showed that the notes purchased by it were secured by a deed of
> trust which constituted a first lien upon the property; but by a fraudulent
> combination between the original payee in the note and the grantor in the deed of
> trust, the lien was, without any fault upon the part of the Roanoke Savings Bank,
> marked "satisfied," and the legal title to the property, which was held by the
> trustee named in the deed to secure these two notes held by it, . . . was by this

12

fraud defeated and rendered wholly valueless.  The Covenant Building & Loan
Association, ignorant of the true situation, with nothing to put it on inquiry as to
the transfer of these notes dealt with the record as it found it. . . . The result of it is
that the deed to secure the notes held by the Roanoke Savings Bank was by these
transactions released, so far as the Covenant Building & Loan Association is
concerned; and that association, being an innocent purchaser, relying upon the
public record, stands to-day before the court with an equity equal to that of the
Roanoke Savings Bank, and with a legal title vested in the trustee for its benefit.

95 Va. at 299-300; 28 S.E. at 324.[5]

In reaching its conclusion, the Court cited and followed an earlier decision by the United

States Supreme Court. *Williams v. Jackson*, 107 U.S. 478, 2 S.Ct. 814, 27 L.Ed. 529 (1883).  The

facts of *Williams* were summarized by a later decision of the Circuit Court of Appeals for the

Fourth Circuit as follows:

In that case owners of property had conveyed the legal title to trustees to secure
the payment of notes contemporaneously executed, which were transferred to a
bona fide holder for value.  Subsequently the trustee, without authority from the
holder of the note, released the deed of trust in favor of the grantor, who
thereupon executed a new note and deed of trust on the same property; one of the
trustees thereunder being one of the trustees who had joined in wrongfully
releasing the original deed of trust.  The note thus secured was delivered for value
to a lender, one Williams, who had no notice of the transfer of the note secured by
the first deed of trust or that same was unpaid.  After sale under the second deed
of trust, suit was brought by the holders of the notes secured by the first to have
them declared a lien upon the property.

---

[5] In an interesting twist, the Court (albeit with two judges dissenting) reached the opposite
conclusion with respect to the Rutherford Street parcel and held that the Bank prevailed over
Evans Brothers.  The Court reasoned that because there was already a deed of trust securing Old
Dominion, Reed had only equitable title when she executed the deed of trust in favor of Evans
Brothers, the legal title being vested in the trustees of the Old Dominion deed of trust.  As a
result, the trustees of the Evans Brothers deed of trust themselves had only equitable title, and
the Court held that as between parties with equal equity (the Bank and Evans Brothers), the older
equity (the Bank's) prevailed.  95 Va. at 303, 28 S.E. at 325.

*Ballard Bros. Fish Co., Inc. v. Borum*, 49 F.2d 581 (4th Cir. 1931).  The Supreme Court, in

holding that the holders of the notes secured by the improperly-released deed of trust were not

entitled to relief, stated:

> Williams is admitted to have had no actual knowledge that the notes secured by
> the first trust deed were held by the plaintiffs, or that they were unpaid. . . . To
> charge Williams with constructive notice of the fact that the notes had not been
> paid, in the absence of any proof of knowledge, fraud, or gross or willful
> negligence on his part, would be inconsistent with the purpose of the registry
> laws, with the settled principles of equity, and with the convenient transaction of
> business. . . . The equity of Williams being at least equal with that of the
> plaintiffs, the legal title held for Williams must prevail, and he is entitled to
> priority.

*Williams*, 107 U.S. at 483-84, 2 S.Ct. at 818-19.

The position of HSBC is indistinguishable from that of Roanoke Savings Bank with

respect to the Walker Street parcel in the *Evans* case.  HSBC says the deed of trust securing its

note was released by someone who was not the actual noteholder and had no authority to do so.

That is exactly what happened to Roanoke Savings Bank.  And yet, the Bank's equitable claim to

the property was subordinated to that of Covenant, which, because it relied on the public record,

was equally blameless but had the advantage of legal title.  No subsequent opinion of Virginia's

highest court has questioned or cast doubt upon the holding in *Evans*, which appears to be

consistent with case law from other jurisdictions dating from the same era..  *See, e.g., Vogel v.

Troy*, 232 Ill. 481, 83 N.E. 960 (Ill. 1908) (holding that bona fide purchase for value took land

free and clear of deed released by trustee who never remitted payoff of note to holder).   It is

certainly an interesting question—given the age of the *Evans* opinion and the weight of authority

to the contrary in more recent opinions from other states—if the Supreme Court of Virginia

would adopt a different view if presented with the issue today.  Until it does so, however, or at

the very least signals that it might, this court must assume that *Evans* is still the prevailing law in

the Commonwealth of Virginia. Accordingly, the court finds that—at least in the absence of

constructive notice that the deed of trust had not been validly released—a bona fide purchaser

would take free and clear of it.

D.

HSBC asserts, however, that a purchaser from the debtor on June 9, 2008, the filing date

of the petition, would have had constructive notice that some sort of fraud was afoot based on the

unusual series of conveyances, encumbrances, and releases reflected in the land records for the

six-month period after the debtor first acquired title to the property. Although a trustee's strong-

arm powers are not defeated by any actual knowledge the trustee may possess, the trustee is

bound by constructive notice. *Satterfield v. Sigmon* (*In re Mahaffey*), 91 F.3d 131 (4th Cir.1996)

(unpublished table decision); *In re Sudds*, 355 B.R. 525 (Bankr. M.D. N.C. 2006); *In re Morgan*,

96 B.R. 615 (Bankr. N.D. W.Va. 1989). As this court has previously explained:

> To obtain the status of a bona fide purchaser [in Virginia], one must have neither
> actual nor constructive notice of any defects in the chain of title. *Roanoke Brick
> & Lime Co. v. Simmons*, 2 Va.Dec. 70, 20 S.E. 955, 956 (1895) ("The purchaser is
> bound not only by actual, but also constructive, notice, which is the same in effect
> as actual notice."). In making a purchase, the buyer must search the chain of title,
> as required by the recording statutes, and exercise a degree of care when
> examining the records to ensure that the grantor has good title and that the
> property is free of encumbrances. "The great weight of authority is to the effect
> that the recordation of an instrument gives constructive notice of all the facts
> expressly stated in the instrument *and other matters therein suggested which
> might be disclosed upon prudent inquiry*." *Chavis v. Gibbs*, 198 Va. 379, 382, 94
> S.E.2d 195, 197 (1956).

*Reasonover*, 236 B.R. 232-33 (emphasis added). The question then is whether, as HSBC asserts,

the fact that a title search would have shown the property changing hands six times in a brief

period of time after the debtor first acquired title before returning to the debtor's ownership, and

a total of 12 deeds of trust—all reflecting loans from the same lender—being recorded and

released within that same period, would "have excited the suspicion of a purchaser of ordinary

care and prudence, and would have led to the discovery that the recorded Certificate of

Satisfaction was invalid and the result of fraud by the Debtor." Amended Complaint, ¶ 24.

As a preliminary matter, the trustee, citing a prior opinion by this court, argues that under

§ 55-105, Code of Virginia, a bona fide purchaser would not have to look to conveyances

predating the one by his seller acquired title. *Wilson v. Moir (In re Wilson)*, 359 B.R. 123, 131-

34 (Bankr. E.D. Va. 2006). But that considerably overstates both the holding of *Wilson* and the

effect of the statute, which simply protects a purchaser from conveyances or encumbrances, even

if recorded, that are *outside the chain of title*. Specifically, Section 55-105 provides:

> A purchaser shall not, under this chapter, be affected by the record of a deed or
> contract made by a person under whom his title is not derived; nor by the record
> of a deed or contract made *by any person under whom the title of such purchaser
> is derived*, if it was made by such person before he acquired the legal title of
> record.

(emphasis added). In *Wilson*, the issue arose because the debtor financed a purchase of real

estate with the proceeds of three separate loans, with the deed of trust securing one of them being

recorded *prior* to the deed by which she acquired title. But that is a completely different issue

from the one presented here. Nothing in *Wilson* or in the language of § 55-106 suggests that a

bona fide purchaser is not required to search the chain of title. Indeed, construction of a chain of

title is fundamental. Douglas W. Dewing, A Virginia Title Examiner's Manual § 8-1 (3rd ed.

1998) ("Every title search in Virginia involves the construction of a chain of title for the period

covered by the examination."). The customary period of examination in Virginia is to a general

16

warranty deed recorded at least sixty years prior to the examination. *Id.* at § 8-2. The process of constructing a chain of title has been described as follows:

> Beginning with the earliest link in the chain, the records are examined in the name of each owner from the date the property was acquired through the date of recordation of the transfer of title to the next owner. It is, of course, the dates of transfer and not the dates of record that control the beginning point of each such examination, and the dates of record rather than the dates of transfer that control the ending point of each. The title examiner's purpose is to determine whether or not the owner has made any conveyances during the period that affect title and whether any liens have attached to the property during the period of ownership. The examiner has no responsibility for matters beyond the chain of title. *Kiser v. Clinchfield Coal Corp.*, 200 Va. 517, 523, 106 S.E.2d 601 (1959).

Dewing, § 8-1. Thus, a prudent and diligent purchaser in Virginia could not limit its examination of the land records to the period beginning with the date the seller acquired title but would be charged with constructive notice of anything that might be revealed if title were traced back to a general warranty deed recorded at least 60 years prior to the current sale.

In the present case, it is undisputed that an examination of the land records on the filing date of the bankruptcy petition would have revealed an unusual sequence of transfers, encumbrances, and releases that took place over a six-month period ending some two years previously. The question remains, however, whether those transactions, standing alone, would suggest to a prudent purchaser that the first of the twelve deeds of trust—the one on which the plaintiff relies—was released without authority. This is not a situation in which an assignment of the deed of trust had been recorded that would alert a party that FMI was no longer in possession of the note at the time the certificate of satisfaction was recorded. Nor has the plaintiff pointed to any other instrument in the chain of title that references anyone other than FMI as being the holder of the note at the time the deed of trust was released. The "flipping" of real estate is not inherently fraudulent. And to the extent the number and timing of the

transactions here do suggest something untoward, what they most logically point to is a "kiting"

scheme in which the proceeds of later loans were used to pay off earlier loans before payments

were due to commence.  Such a scheme might well raise questions as to whether the *last* of the

deeds of trust had been properly released, but provides no logical basis for questioning whether

the *first* had been released.  But even the inference of a "kiting" scheme, if it were drawn, would

be diminished, if not entirely negated, by the 2-year passage of time since title became vested the

second time in the debtor.

HSBC, moreover, has pointed to no reported Virginia opinion in which a mere pattern of

conveyances has been held to constitute notice of fraud.  Rather, the Virginia cases focus on

whether documents in the chain of title refer to interests or unrecorded conveyances in a manner

that would impel a prudent purchaser to investigate further.  *Chavis*, for example, involved a

purchaser (Chavis) who claimed title under a deed recorded in 1948 that recited that the

conveyance was subject to a recorded deed of trust which, as it turns out, not only had not been

released, but had been foreclosed upon some 20 years earlier, although the foreclosure deed was

not recorded until after the deed to Chavis was placed on record.  Under the Virginia statutes

then in effect, the time for enforcement of a deed of trust and recording a foreclosure deed had

not yet run at the time Chavis recorded his deed.   Under those circumstances, the Court held,

"The recitals in the deed to Chavis put him on inquiry as to the rights of the beneficiary in the

deed of trust.  He had notice that the debt thereby secured had not been paid, and that it was long

past due. . . .  If reasonable and prudent inquiry had been made and full answers obtained, he

would have discovered that because of default in the payment of the notes, the property had been

sold in accordance with the provisions of the deed of trust."  198 Va. at 387, 94 S.E.2d at 201.

18

And in *Roanoke Brick & Lime*, a purchaser (Meeks) who had given $3,500 in notes to the seller

(Roanoke Brick and Lime Company) in turn sold the property to one Ranson.  At the time he did

so, $3,220 of the notes remained unpaid, and Ranson, in the deed, assumed and agreed to pay

them.  The deed to Ranson contained language that Meeks had done no act to encumber the land

"except the deed of trust above mentioned," although in fact no deed of trust is mentioned or

identified, and, indeed, no deed of trust had ever been recorded.  In any event, Ranson then

executed a deed of trust securing two $890 notes to Meeks for the purchase price.  One of those

notes came to be held by Fidelity Loan & Trust Company.  When the note went into default,

Fidelity moved to foreclose, and Roanoke Brick & Lime brought a suit in equity to establish its

lien.  With respect to Fidelity's argument that it was a bona fide purchaser not bound by the

unrecorded deed of trust securing the notes to Roanoke Brick & Lime, the Court reasoned:

> It may be conceded that there is enough on the face of the deed from Meeks to
> Ranson . . . to put Ranson, and all who claim under him, upon inquiry as to the
> existence of the deed of trust . . . for it expressly appears that Meeks refuses to
> covenant that he has "done no act to incumber said land," but declares, on the
> contrary, that he has "done no act to incumber the said land, except the deed of
> trust above mentioned."  There is no deed of trust above mentioned in the deed,
> but it does appear that . . . Ranson . . . covenants to pay the 92 notes of $35 each
> to the Roanoke Brick & Lime Company.  Any one, therefore reading this deed
> with ordinary care, would probably—indeed, naturally, if not
> necessarily—conclude that the reference to the deed of trust had relation to the 92
> notes of $35 each; and going one step further back in the chain of title, and
> reading the deed [from Roanoke Brick & Lime to Meeks] along with that [from
> Meeks to Ranson], one could hardly escape the conclusion that the Roanoke
> Brick & Lime Company was the beneficiary of the of the trust, if one existed. . .
> [and] was at least sufficient to put any man exercising reasonable caution upon
> inquiry, and sufficient also to direct and point that inquiry to the Roanoke Brick
> & Lime Company as the person likely to be interested.

20 S.E. at 956.[6]

---

[6] Although Roanoke Brick & Lime was successful in clearing the constructive notice hurdle, it
(continued...)

19

Neither *Chavis* nor *Roanoke Brick & Lime* is remotely analogous to this case.  In *Chavis*, the deed of trust, although ancient, had never been released, while in *Roanoke Brick & Lime*, recitals in a later recorded deed made express reference to a deed of trust with enough information to identify the secured party.  Nor is the court persuaded by HSBC's argument that there is something suspicious about the fact that releases of the prior deeds of trust were recorded after the new deeds of trust had been put on record.  Indeed, that would be the expected sequence of events when a deed of trust is paid off, either in the context of a sale or a refinance of an existing loan, since a new lender would ordinarily disburse funds only when the deed of trust securing its loan was placed on record, at which time the payoff funds would be transmitted to the holder of the existing loan against the property, which would then execute a certificate of satisfaction.  In the nature of things, some finite period of time is required for the transmission and processing of the payoff, and the return of the certificate of satisfaction, and the applicable Virginia statute, undoubtedly in recognition of that reality, allows a lien creditor 90 days in which to furnish the certificate.  Va. Code Ann. 55-66.3.  Accordingly, there is nothing untoward in the certificate of satisfaction with respect to the old deed of trust being recorded after the date a new deed of trust is recorded.

### III.

Because HSBC has not pleaded sufficient facts to plausibly establish that a bona fide purchaser would have constructive notice that the deed of trust was released without authority, the trustee's powers as a hypothetical bona fide purchaser allow him to administer the property

---

[6](...continued)
did not ultimately prevail, since at trial it was unable to produce the deed of trust or prove by sufficient evidence that a deed of trust had actually been executed.

free of HSBC's equitable claim for the reinstatement of its deed of trust, even if, as HSBC

asserts, the deed of trust was falsely released.  At oral argument, HSBC asserted that, regardless

of the ruling on constructive notice, HSBC was entitled to proceed on its constructive trust

claim, which it characterized as a "fall-back" position.  As discussed above, however, the

trustee's strong-arm powers under § 544(a) trump a constructive trust asserted under § 541(d)

unless, under applicable state law, a constructive trust would be enforceable against a bona fide

purchaser. *Reasonover*, 236 B.R. at 227 (discussing split of authority and adopting majority

view).  Since a bona fide purchaser in Virginia would take free of a latent claim for imposition of

a constructive trust, so does the trustee.

      A separate order will be entered granting the motion to dismiss.


Date: _____           _____
                                       Stephen S. Mitchell
Alexandria, Virginia                   United States Bankruptcy Judge


Copies to:

Richard E. Lear, Esquire
Holland & Knight LLP
2099 Pennsylvania Ave.,NW #100
Washington, DC 20006
Counsel for the plaintiff

Alexander McDonald Laughlin, Esquire
Wiley Rein LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA 22102
Counsel for the defendant

**Summary of Transfers, Encumbrances, and Releases**
**4826 Eisenhower Ave., Unit 465, Alexandria, Va.**

| Date | Recorded | Grantor | Grantee | Amount | Released |
|------|----------|---------|---------|--------|----------|
| 06/01/2005 | 06/09/2005 | Exchange at Van Dorn LLC | Vijay Taneja | | |
| 06/01/2005 | 06/09/2005 | Vijay Taneja | (D/T) | $ 375,920.00 | 08/18/2005 |
| | | | | | |
| 07/11/2005 | 07/12/2005 | Vijay Taneja | Leela Singh | | |
| 07/11/2005 | 07/12/2005 | Leela Singh | (D/T) | $ 376,000.00 | 08/30/2005 |
| 07/11/2005 | 07/12/2005 | Leela Singh | (D/T) | $ 94,000.00 | 08/30/2005 |
| | | | | | |
| 07/25/2005 | 07/27/2005 | Leela Singh | Pawan Kumar Bajpai | | |
| 07/25/2005 | 07/27/2005 | Pawan Kumar Bajpai | (D/T) | $ 391,960.00 | 08/30/2005 |
| 07/25/2005 | 07/27/2005 | Pawan Kumar Bajpai | (D/T) | $ 97,990.00 | 08/30/2005 |
| | | | | | |
| 08/10/2005 | 08/12/2005 | Pawan Kumar Bajpai | Satish Chander Sood | | |
| 08/09/2005 | 08/12/2005 | Satish Chander Sood | (D/T) | $ 392,000.00 | 09/22/2005 |
| 08/09/2005 | 08/12/2005 | Satish Chander Sood | (D/T) | $ 98,000.00 | 09/22/2005 |
| 08/24/2005 | 08/24/2005 | Satish Chander Sood | (D/T) | $ 367,500.00 | 10/20/2005 |
| | | | | | |
| 09/21/2005 | 09/22/2005 | Satish Chander Sood | Hua Xu | | |
| 09/21/2005 | 09/22/2005 | Hua Xu | (D/T) | $ 384,000.00 | 10/20/2005 |
| 09/21/2005 | 09/22/2005 | Hua Xu | (D/T) | $ 96,000.00 | 10/20/2005 |
| | | | | | |
| 10/19/2005 | 10/19/2005 | Hua Xu | Anita Rashid | | |
| 10/19/2005 | 10/20/2005 | Anita Rashid | (D/T) | $ 392,000.00 | 03/20/2006 |
| 10/19/2005 | 10/20/2005 | Anita Rashid | (D/T) | $ 98,000.00 | 03/20/2006 |
| | | | | | |
| 11/30/2005 | 03/20/2006 | Anita Rashid | Vijay Taneje | | |